## Benjamin Atwood v. Valentine Cornwall.

*Evidence : Statements : Counterfeit money : Identity : Genuineness.* The statements of persons not witnesses, through whose hands a treasury note has passed, are not admissible in evidence, either for purposes of identification, or to prove the note counterfeit, in a suit brought by one who has taken such note, to recover its value.

*Evidence.* The production of a genuine bill by the defendant on a former trial before a justice of the peace, but not as a witness, in the absence of any showing of admissions or statements in regard to it, was immaterial, and evidence of it should not have been admitted.

*Evidence : Statements not denied.* The statement of a fact by one of the parties, in the presence of the other, and not denied, is admissible as evidence of the fact so stated.

*Admissions.* Where counsel, to avoid the necessity of having a witness called, admit what he would testify to, they will not be permitted to rely on refined distinctions which could have been obviated by a fuller examination.

*Evidence : Experts : Bankers : Counterfeit money.* Bankers are competent to testify as to the genuineness of a treasury note.

*Counterfeit money : Diligence : Delay : Fraud.* The taker of counterfeit coin, or paper money which has been made legal tender by law, must use due diligence to ascertain its character and to notify the giver, to entitle him to recover its value.

Any unnecessary delay beyond such reasonable time as would enable the taker to inform himself as to its genuineness, operates as a fraud on the giver, and prevents a recovery.

*Negotiable paper: Genuineness: Coin: Legal tender notes: Payment.* Whether the rule that a party passing negotiable paper warrants its genuineness, is applicable to payments made in coin or legal-tender notes:—*Quære?*

*Heard October 15. Decided November 5.*

Error to Kalamazoo Circuit.

*Edwards & Sherwood,* for plaintiff in error.

*Balch, Howard & Balch,* for defendant in error.

CAMPBELL, J.

Cornwall sued Atwood before a justice of the peace to recover back fifty dollars, which he claimed as the amount of a counterfeit bill received of Atwood on a balance of account. Judgment having been rendered for defendant before the justice, Cornwall appealed to the circuit, where he recovered against Atwood, who now brings error. The evidence shows that the settlement was made March 4, 1867, and that Cornwall returned the fifty dollar bill now claimed to be counterfeit, to Atwood, August 9, 1867. Upon the trial questions arose whether any such bill was paid to Cornwall by Atwood, as well as whether the bill was identified, and was counterfeit, and whether the delay should affect the rights of the parties. Also, there were objections made to the admission and rejection of evidence.

There was evidence given tending to show that Cornwall transferred the note in question to one Kellogg, who, on the same day, or immediately thereafter, returned it. Cornwall was allowed to testify that Kellogg, when he returned it, said it was bad. Kellogg was allowed to state his conversation with Mr. Brees, a banker, with whom he deposited it.

The only questions material to the issue, which were touched upon by this evidence, were the identity and the genuineness of the bill in question. Identity could only be made out by tracing the bill through the various hands into which it had been passed. Genuineness could only be determined

28 MICH.—43.

by evidence on the trial.   To prove identity it was only necessary to show the transfer from Atwood to Cornwall, Cornwall to Kellogg, Kellogg to Sheldon & Co. (of whom Brees was a partner), and back from these various parties to Atwood.   The conversations and opinions of any of them were foreign to the subject of identification, and could not be lawful evidence of the bad character of the note. They were not legitimate for any purpose, and had a direct tendency to lead the jury to assume the bill was counterfeit, from mere hearsay.   The fact that several persons had so treated it could not fail to impress them, although all of these acted on one man's opinion, who was not sworn in the cause.   Kellogg claiming it to be bad was perhaps so connected with the *res gestæ* that it might be received with a proper caution to the jury that it was no evidence of the fact that it was counterfeit.   But his statements as to what was told him by others are not within that rule. This testimony ought to have been excluded.

It is also difficult to perceive any pertinence in the testimony allowed to be introduced, that on the trial before the justice, Atwood produced a genuine bill.   It does not appear that he did it as a witness, nor that he made any admissions or statements in regard to it.   He had a right to take any proper measure to test the memory and honesty of Cornwall, who was seeking to cast a liability on him as having passed a bad bill; and as the question of identification was throughout a very important one, the course alleged to have been taken before the justice was in no way reprehensible, and was not a proper subject of proof as such at the circuit.

The justice who tried the cause below gave testimony as to various conversations between the parties in his presence. This testimony was in the form of a written statement which the parties admitted contained such facts as he would swear to if put on the stand.   His statement contained the following clause, which was ruled out as inadmissible:   "Atwood said to him, you did not take the number of the bill

until after you tried to get me to take it; and Cornwall did not deny it. I understood him to admit that ho did not take the number of the bill until after he carried it back to Atwood."

The time when Cornwall took down the number of the bill was very material. It was the only mark by which he claimed to identify it. If not taken down before its delivery to Atwood, the question of identity was left very much in doubt. The record contains no other proof definitely and positively connecting that bill with the one paid over to Kellogg and deposited with Sheldon & Co. Cornwall, on his cross-examination, admitted that he took down the number when he returned it to Atwood, and there was room for an argument upon a comparison of that with his direct testimony on the same subject. If he admitted that fact in a conversation with Atwood, or if when conversing fully on the subject he did not deny it when asserted, this was pertinent and should have been received. The statement of the justice that he understood Cornwall to admit the fact, is not given as an expression of opinion, but as a fact, and is the only way in which conversations can often be proven. If obscure, it could have been made clear by further statement or cross-examination. Where counsel, to avoid the necessity of having a witness called, admit what he would testify to, they cannot be permitted to rely on refined distinctions which could have been obviated by a fuller examination.

We see no error in allowing the character of the note to be shown by bankers. It would be impracticable to obtain the testimony of the treasury officers on all occasions, and those who are in the habit of handling money constantly become sufficiently skilled to detect from its appearance, with some degree of certainty, whether it is genuine. This knowledge is not necessarily obtained from seeing other bills of the same series, or even of the same denomination, although a person who has not seen fifty dollar bills must have had a very limited experience in

banking. It is well understood that counterfeits are oftener detected from general appearances not easy to be explained, than from any investigation of letters and numbers. The knowledge shown in the case before us was sufficiently general to show the witness ought to have been able to give an opinion on the note in question. It was a legal tender, with which all persons are expected to have some acquaintance. The rule as to proof of counterfeits, which has been enforced in criminal prosecutions, would always have allowed such testimony, and we think it was properly received.

A more important question, however, arises concerning the relative duties and liabilities of parties who honestly receive and pay out counterfeit money.

The general current of authority appears to sustain the position that a person passing negotiable paper warrants its genuineness to such an extent that he is bound to make it good, if found bad and returned within a proper time. But where paper is genuine but worthless, although not supposed to be so by either party, the authorities are in conflict as to such liability and its extent. The decisions applied to bank-notes have all gone upon the analogy of ordinary negotiable securities. There is no modern decision which we have been able to find, which draws any line in dealing with payments in counterfeits, or refers specially to that coin or paper which the law deals with as money—receivable not by currency merely, and by consent, but by statute and by obligation.

The decisions, in giving reasons for their results, were originally based on the doctrine that payments by negotiable paper were in a measure conditional, and not absolute in all cases, but dependent on the possibility of getting payment by diligence. And the distinction between counterfeit and otherwise valueless paper has not always been kept up, nor always well defined. See authorities in *Story on Cont.*, § *411; Edwards on Bills, 205-6-7, and notes.*

The decisions, however, agree generally that a party who

would otherwise be able to recover back the amount of bad money passed upon him, will be debarred of his action by lack of diligence. And it is much to be regretted that upon the whole subject there are more *dicta* than decisions. It is necessary, in order to discover the real difficulties of the matter, to consider how the doctrine bears practically on the business of the community.

The paper which is in controversy is for all legal purposes of currency on a similar footing with coin; that is to say, it is a legal-tender, and all creditors are compelled to receive it in payment. They do not exercise an option in taking it, as they do in receiving other paper. Inasmuch as they refuse a tender at their peril, the law assumes, and business must be done on the basis, that every business man will become generally familiar with the appearance of the money of the country, so as to be able to exercise a judgment upon it. And while those who are constantly handling money in banks and exchange offices cultivate their faculties more thoroughly in a knowledge of currency, all persons are supposed to have some such knowledge,—sufficient to enable them to do business with ordinary security. And it is not to be expected that among ordinary dealers one will have any great advantage over others; while all have means of access, in every community, to some persons who have by their peculiar experience the means of aiding the judgment of those of less experience.

It is not customary, and cannot be expected, that persons will note down all the bills which they receive, and put ear-marks on them, so that they can recall the persons from whom they are received. Nothing would have a surer tendency to hinder the negotiability of genuine bills than such ear-marks; while the delay and trouble of doing so would be a great hindrance to the dispatch of business. Most currency gets into circulation through the medium of banks, and other instrumentalities capable of detecting bad money; and where counterfeit money is circulated, it is usually uttered in such quarters as to render

it difficult, if not impossible, to trace it back to its source. The innocent taker of such paper is not generally guilty of any culpable negligence; and between several successive takers it is impossible to hold one any more in fault than the rest, for not detecting the cheat. It is often nothing but a suspicion of forgery that induces a taker to notice from whom he receives a particular bill; and where this suspicion is entertained, and not communicated to the person from whom the paper is received, its concealment may easily operate as a fraud upon him, by preventing him from tracing it back. This would create a strong moral equity in his favor, whatever the law may determine in regard to it.

At common law, such authority as we have seems to indicate that, as between two innocent parties, the taker of counterfeit coin cannot claim recourse against him from whom he took it.—*Shep. Touchstone, 140; Wade's case, 5 Co., 114.* This must have been on the ground already referred to, that parties in equal equity shall not be disturbed. The common law and equity are both full of instances where persons dealing honestly on an equal footing, and with equal means of knowledge, are left where their dealings have placed them,—neither having recourse against the other to undo their agreements or transactions. And while in *Markle v. Hatfield, 2 J. R., 455,* Kent, C. J. doubts the propriety of the doctrine, the case called for no such doubts, and no decisions were found shaking it. It cannot be denied that there is much force in the doctrine which requires a party to be vigilant before taking bad money. That, after all, is the only rule likely to prevent its circulation. A person who takes it without dispute and examines it afterwards, if he is able to remember from whom he took it, and is allowed to recover back the amount, may save himself, but will usually subject an equally innocent party to loss. And it is also manifest that if he is ready to testify positively from whom he received it, his adversary cannot generally be as certain

whether or no he paid it out, and cannot, by his own oath alone, even if he is certain, convict a false witness of perjury. It will never do, in laying down rules, to overlook the consequences.

If the rule of liability is to be, enforced, it cannot be justly enforced without requiring a degree of vigilance conforming to the occasion. If payment in what is supposed to be legal tender paper is to be regarded as contingent and not absolute, the receiver should be regarded as having elected to retain it unless he uses speedy and active diligence to determine its character, and to notify the giver that he may protect himself against prior parties. In *Camidge v. Allenby, 6 B. & C., 373*, a party who kept broken bank bills seven days without action was held estopped. In *Jennison v. Parker, 7 Mich. R., 355*, this rule of diligence was applied where a debtor had indorsed a note as collateral security, and it was not protested as against him. In *Phœnix Ins. Co. v. Allen, 11 Mich. R., 501*, and *Phœnix Ins. Co. v. Gray, 13 Mich., 191*, it was held a party receiving sight paper was bound to forward it without any delay beyond what was necessary in the ordinary course of business, or compelled by circumstances. The rule gathered from the cases by Mr. Edwards is that in regard to forged paper also, there must be no "unnecessary delay."—*Edwards on Bills, 207, 551*. It is entirely safe to say that a person taking such paper should not, without some adequate excuse, retain such paper without action beyond such time as would give him reasonable opportunity to inform himself without inconvenience or a neglect of other business to attend to it. The necessity for promptness exists in all cases; and where it appears there has been any delay beyond what was reasonably adequate under the circumstances to enable the party to inform himself, he should not recover. And there should be some care in the taking as well as afterwards.

In the present case it appeared from plaintiff's testimony that he kept this money on his person more than five months,

without at any time attempting to obtain the opinion of any banker upon it, although several times where he had the means of doing so. It certainly can never be contemplated that a person, whatever may be the extent of his dealings, can keep alive the liability of another upon paper taken from him, without some use of his opportunities for information. And when it affirmatively appears that he has neglected his opportunities, there is no question left for a jury. And in such cases, therefore, the facts being clear, the result is one of law.

The court should have granted the request to that effect, and it becomes unnecessary to decide the question whether the payment, when honestly made, and without suspicious circumstances, would have been absolute, if diligence had been used to discover the quality of the paper.

. The other Justices concurred.